## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| COLEEN BRESLIN | : | |
| 124 Hampshire Drive | : | |
| Sellersville, PA 18960 | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | No. _____ |
| v. | : | |
| | : | |
| BOROUGH OF SOUDERTON | : | |
| 31 West Summit Street | : | **JURY TRIAL DEMANDED** |
| Souderton, PA 18964 | : | |
| | : | |
| Defendant. | : | |
| | : | |

## CIVIL ACTION COMPLAINT

Plaintiff, by and through her undersigned counsel, hereby avers as follows:

## INTRODUCTION

1.      This action has been initiated by Coleen Breslin (*hereinafter* referred to as "Plaintiff," unless indicated otherwise) against the Borough of Souderton (*hereinafter* referred to as "Defendant") for violations of Title VII of the Civil Rights Act of 1964 ("Title VII - 42 U.S.C. §§ 2000d *et. seq.*) and the Pennsylvania Human Relations Act ("PHRA"). As a direct consequence of Defendant's unlawful actions, Plaintiff seeks damages as set forth herein.

## JURISDICTION AND VENUE

2.      This Court has original subject matter jurisdiction over the instant action pursuant to 28 U.S.C. §§ 1331 and 1343(a) (4) because it arises under the laws of the United States and seeks redress for violations of federal laws. There lies supplemental jurisdiction over Plaintiff's state-law claims because they arise out of the same common nucleus of operative facts as Plaintiff's federal claims asserted herein.

3.      This Court may properly maintain personal jurisdiction over Defendant because its contacts with this state and this judicial district are sufficient for the exercise of jurisdiction over Defendant to comply with traditional notions of fair play and substantial justice, satisfying the standard set forth by the United States Supreme Court in *International Shoe Co. v. Washington,* 326 U.S. 310 (1945) and its progeny.

4.      Pursuant to 28 U.S.C. §§ 1391(b)(1) and (b)(2), venue is properly laid in this district because all of the acts and/or omissions giving rise to the claims set forth herein occurred in this judicial district, and Defendant is deemed to reside where it is subject to personal jurisdiction, rendering Defendant a resident of the Eastern District of Pennsylvania.

## PARTIES

5.      The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

6.      Plaintiff is an adult individual, with an address as set forth in the caption.

7.      The Borough of Souderton ("Defendant") is a municipality with a population of approximately 7,000 – 8,000 people. Defendant is a suburb outside of Philadelphia in Montgomery County, Pennsylvania.

8.      At all times relevant herein, Defendant acted by and through its agents, servants and employees, each of whom acted at all times relevant herein in the course and scope of their employment with and for Defendant.

## FACTUAL BACKGROUND

9.      The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

10.     Defendant operates as a municipality in Montgomery County through various divisions or departments, including operating its own (Souderton Borough) Police Department (hereinafter, the "SBPD").

11.     Plaintiff was hired by Defendant within its SBPD effective on or about December 5, 2022; and in total, Plaintiff was employed by Defendant for almost three (3) years.

12.     The SBPD (a division or department of Defendant) at any given time has operated by and through approximately 8-11 employees, inclusive of administrative support, and evidence technician, officers, a detective, a sergeant, and the Chief of Police.

13.     Upon hire, Plaintiff worked as a part-time police officer, and Plaintiff took such a role expecting that she would over time be converted to a full-time police officer. It was well known that Plaintiff desired and sought the first full-time officer position that would become available (after her hire), and she was continually assured of same upon availability.

14.     As of Plaintiff's hire within the SBPD, Brian Newhall ("Chief Newhall") was the then Chief of Police.

15.     Defendant exhibited a long history and long pattern of gender discrimination towards female applicants and female officers within its SBPD. In fact, despite that Defendant had been an established municipality *for in excess of 100 years*, no female officers had ever been considered or hired prior to 2020.

16.     Two (2) male officers had been hired shortly before Plaintiff was hired within Defendant, and they were both given full-time hours and a work schedule. Plaintiff (as a female) was the only officer given a "part-time" schedule.

17.     There was ample work, hours, budget, and business need for Plaintiff to work as a full-time officer *upon hire*. Shortly after hire, Plaintiff formed the opinion that a determinative

factor in her assignment to a part-time role was on account of her gender and that a male would have likely been hired full-time (unlike her). Nonetheless, Plaintiff expected to simply prove herself and do an excellent job on a part-time basis so that giving her a full-time schedule would hopefully come naturally in the (then) not-too-distant future.[1]

18.      Due to business and staffing needs, the SBPD (and its personnel) were informed in 2023 that Defendant was going to hire for at least two (2) full-time police officers. In 2023, Defendant in fact approved a 2024 budget for two (2) additional full-time police officers.

19.      Thrilled about the opportunity to become full-time and have a long-term (or permanent) career with the SBPD, Plaintiff took a written exam and underwent a physical in 2023. Plaintiff who had been a strong performer since her hire, passed both the aforesaid exam and physical components to become a full-time police officer.

20.      Plaintiff was conclusively told all she had to do to be elevated to a full-time officer (post-exam and post-physical) was meet and interview with Chief Newhall, <u>nothing more</u>. This was made very clear to her.

21.      Plaintiff is a rule-follower, ethical, and what would be proverbially known as someone who is by the book. Thus, she was compelled to follow what she perceived as a gender-based discriminatory policy of Defendant (related to a disclosure of her pregnancy).

---

[1] Plaintiff gives background of her non-consideration of full-time work upon hire in support of her overall gender discrimination claims in this lawsuit (as evidence or facts <u>predating</u> legal claims or asserted adverse actions is permissible to support such assertions and other independent claims). However, Plaintiff did not initiate a Charge with the EEOC or PHRC timely enough to encompass this specific adverse action against her. Thus, in the interest of absolute clarity herein, Plaintiff references such evidence (related to her hire) but does not assert in this lawsuit that her hire as a part-time officer (instead of full time) is an independent legal claim.

22.    Defendant had a documented and disseminated (highly unusual) policy that either was facially discriminatory or was likely to result discrimination (by application). Defendant's policy and/or regulation; and in particular, regulation 1027.7.1, stated in pertinent part:

> **<u>Pregnant employees should notify their immediate supervisors as soon as practicable</u>** and provide a statement from their medical providers identifying any pregnancy-related job restrictions or limitations. [And discussion in the policy continues that such pregnant employee may be approved for leave under the FMLA…]
>
> *See* SBPD Regulation 1027.7.1 (Emphasis added).

23.    Defendant's aforesaid policy was discriminatory towards woman for numerous reasons including *inter alia*:

> (1) There was not a comparable policy for all genders <u>or</u> males to immediately report injuries, disabilities, or bodily harm or bodily matters that could impede their job performance or ability to perform essential functions (nor such a requirement to affirmatively provide potentially unnecessary medical support for an ability to continue working).
>
> (2) By requiring women to "notify" of pregnancy "as soon as practicable," Defendant ***has conceded*** (*in writing and via direct evidence*) that pregnancy of a woman was a material consideration in such a female's continuing work for the SBPD. <u>This is indisputable</u>.
>
> (3) Lastly, males were not required to disclose when their significant others or spouses were pregnant, despite that such males may also seek or apply for FMLA to take time off from work (to care for their significant other or to care for a newborn).

24.    As aforesaid, as of 2023 (after passing her physical and exam), Plaintiff had been unequivocally told she would be elevated to full-time after simply meeting with Chief Newhall (and that <u>nothing else was required</u>).

25.    By late 2023 though, Plaintiff followed Defendant's (as-soon-as-practicable) pregnancy-disclosure policy and informed Chief Newhall and relevant management that she was – at the time – roughly four (4) months pregnant. This was despite that Plaintiff's pregnancy had

no impact on her performance, did not impact on her job duties, and despite that Plaintiff was still relatively early in her pregnancy (while having no need for FMLA).

26.    The proverbial brakes screeched due to Plaintiff's aforesaid pregnancy disclosures and information sharing, and Defendant did a proverbial 180. Chief Newhall's attitude towards Plaintiff became standoffish, unfriendly, and distant. And Plaintiff was told she was no longer interviewing or meeting with Chief Newhall for the elevation to full-time officer.

27.    After Plaintiff's pregnancy disclosures, she was suddenly told Plaintiff instead had to do her meeting or interview with T2 Police Management Consulting, LLC (hereinafter, "T2") *instead of* Chief Newhall (for consideration of full-time elevation).

28.    A requirement that Plaintiff meet with an outside consulting firm (or with T2) was totally contrary to how male officers were ordinarily hired, promoted, or elevated in any fashion in the past under other Chiefs or Chief Newhall. All prior such hiring, promotions or elevations with males was solely done in-house without usage of outside businesses or outside non-employees.

29.    Chief Newhall told Plaintiff he had recently learned about T2 when talking with Plaintiff and said he heard good things about the organization and thus just decided to have Plaintiff instead do an oral interview or meeting with such a consultant about her elevation to full-time status. Chief Newhall acted in every regard *acted as if he knew nothing about T2* and just wanted an independent assessment of Plaintiff. This was of course – as Plaintiff would later learn – all verifiably false.

30.    Plaintiff quickly learned upon some review and research that T2 generally provided accreditation assistance, training, and grant writing. But Chief Newhall selected his

**close friend** from T2 (Tim Troxel - "Troxel") to meet with Plaintiff. There was <u>no</u> true independence.

31.     Chief Newhall and Troxel worked together for an estimated 20 years together (at Upper Moreland Township). They also attended monthly (Chiefs) meetings together in Montgomery County to discuss personnel matters. Stated differently, Troxel was nothing more than an instrument to do exactly what Chief Newhall wanted under the guise of an "independent" interview. Nothing was independent, there was a clear conflict of interest, and there was a clear deviation from normal hiring or promotion practices.

32.     Troxel and Chief Newhall merely agreed with one another to give a thinly veiled appearance of non-discrimination (to insulate Defendant) by having Troxel ultimately conclude Plaintiff should not be elevated to full-time (via a low oral interview rating), as discussed more *infra*.

33.     By email dated January 8, 2024, Chief Newhall informed Plaintiff that "two full-time officers" are being hired and that Plaintiff was scheduled for an "oral interview" with T2 on January 11, 2024. Plaintiff was further informed in this email that "there are no study materials" and to just "arrive 15 minutes before" the interview. In conclusion, Plaintiff was told in this email to attend unless she was "no longer interested."

34.     Plaintiff of course participated in the interview (led by Troxel), and she felt confident in her communication(s) and dialogue during the interview with Chief Newhall's close friend (the interviewer).

35.     By letter dated January 30, 2024, to Plaintiff (from Chief Newhall), Plaintiff was congratulated for "passing the written portion of the . . . hiring process" but informed that Plaintiff only received a 65% (a failing score) in her oral interview process with T2. Chief Newhall

concluded his letter thanking Plaintiff for her "participation and enthusiasm," wishing Plaintiff the best in her future. Plaintiff was further informed that three (3) candidates scored higher than Plaintiff in the oral interview process. Plaintiff's ranking was a failed score for a <u>very basic</u> interview about rudimentary police or law enforcement issues, so of course this (seemingly intentional) failed rating came as a complete shock to her.

36.   Plaintiff emailed Chief Newhall on February 9, 2024. Therein, Plaintiff: (a) expressed concerns about the subjectivity of the interview and asked for insight into scoring; (b) expressed that Plaintiff didn't believe the scoring accurately reflected her abilities, knowledge, and commitment over the last 14 months (and generally); and (c) that Plaintiff was 6 months pregnant (as of notification of failure) and she was concerned that a "long-term career within this department" was impacted by the "timing of [her] pregnancy."

37.   Plaintiff had thus registered concerns in writing as of 2/9/24 that Defendant considered her pregnancy in taking adverse actions against her with respect to full-time status. Plaintiff also expressed such concerns subsequently verbally as well.

38.   Plaintiff is unaware of any investigation into her concerns expressed in her 2/9/24 email to Chief Newhall (or thereafter). And Plaintiff was not provided with requested information she sought from Chief Newhall either (even through termination of Plaintiff).

39.   There is absolutely no question Plaintiff was denied a full-time officer role because of her gender and/or pregnancy disclosure as of early 2024 (and thereafter). By way of examples only:

    (1)   Plaintiff was suddenly changed from meeting with Chief Newhall for her interview to a third-party consulting business (post-pregnancy disclosure);

    (2)   Defendant deviated <u>from a long history</u> of handling all such matters in-house without use of third parties or third-party businesses;

(3) Chief Newhall lied to Plaintiff about his knowledge of T2 despite his friend and colleague doing Plaintiff's interview whom he knew for over 20 years (and worked with for a long time);

(4) Plaintiff experienced a drastic change in attitude towards her (in addition to a change in who would interview her) in exceedingly close proximity to her pregnancy disclosures);

(5) In a relatively small police department, Chief Newhall was even emailing Plaintiff to attend the interview unless she was no longer interested (despite knowing she was interested). And Chief Newhall, who worked with Plaintiff all the time pre-pregnancy disclosure was wishing Plaintiff well in the future when declining her full-time status. In short, Chief Newhall's communications in writing had even become very distant.

(6) Defendant's policy – as was then written - requiring pregnancy disclosure illustrates pregnancy was a ***material consideration*** to ongoing employment within Defendant;

(7) Plaintiff's concerns of pregnancy considerations preventing her from the opportunity and requests for more information from Chief Newhall were totally ignored;

(8) It was so obvious to anyone that Chief Newhall used his friend to give Plaintiff a lower oral score to insulate Defendant in somewhat of a transparently childish ploy;

(9) Plaintiff was given a low score in her oral interview ***despite*** the interview being about fundamental and basics and Plaintiff having extensive experience in police work and having been able to easily respond appropriately therein; and

(10) It was so obvious that sacking Plaintiff's oral interview score was the only intent that Defendant didn't even care to ask Plaintiff to undergo remedial training or other re-training. Defendant did not care that Plaintiff supposedly failed an oral test about basic police skills *and simply permitted her to keep working as if nothing had occurred* (even telling Plaintiff to just continue working and that no re-retraining of her was necessary). This of course further evidences the pretext.

40.    In addition to the examples illustrating discrimination set forth Paragraph 38(1)-(8), the hiring in lieu of Plaintiff further amplifies the blatant pregnancy discrimination Plaintiff experienced. In particular:

(1) During 2023, Chief Newhall had been continually complaining of short staffing and an immediate need for additional officers. There was such a concern that

Chief Newhall was continually asking officers to volunteer for extra shifts and extra hours.

(2) Unlike Plaintiff who was already Act 120 certified, an experienced police officer, had been through police academy, and performed in an exemplary manner for Defendant in 2022 and 2023 - - Defendant selected another candidate ("Gray") over Plaintiff. As of Gray's selection, she had no legal or law enforcement experience, was not Act 120 certified, and had not even been to a police academy (causing a significant delay in her start of hire).

(3) The selection of Gray in lieu of Plaintiff is so contrary to basic logic and business need at the time *that only a conclusion of discrimination or retaliation could be drawn*.

41.    Plaintiff was then told she was disqualified for consideration of a 2nd full-time officer position that was being hired for in 2024 after Gray (when Plaintiff was approximately 8 months pregnant).

42.    As will be verified during the course of discovery during litigation, both of the candidates hired in lieu of Plaintiff was so much less qualified than Plaintiff that they separated from Defendant shortly after both of their respective hires (following departmental allegations of misconduct or performance concerns).

43.    From in or about March of 2024 and thereafter, Plaintiff was subjected to significant hostility and Plaintiff was not permitted to work many extra shifts that were needed, offered or available. This was as a result of Plaintiff's expressed discrimination concerns and in furtherance of ongoing pregnancy discrimination Plaintiff was experiencing.

44.    From the spring of 2024 through the spring of 2025 (when Plaintiff was last scheduled to work at all), Plaintiff was only offered infrequent and sporadic shifts due to significant business or departmental need.

45.    As of 2024, Plaintiff had suffered the adverse actions of not being hired for two (2) separate full-time positions as an officer – and separately – Plaintiff was being denied

available scheduling, available shifts, and available work (unlike her colleagues). This, as aforesaid, carried into 2025.

46.     As of 2024, Plaintiff had also been denied any meeting, information, data, or documents about why she supposedly scored low during her oral interview with Chief Newhall's friend (in T2) since such questions asked of her were so basic and rudimentary. In addition to really basic questioning, Plaintiff was merely asked about her general work experience (as she had previously worked in corrections and had worked in 2022 and 2023 as a police officer for Defendant).

47.     By May of 2024, Plaintiff felt left with no choice but to initiate a Charge with the Equal Employment Opportunity Commission ("EEOC"). Therein, Plaintiff asserted discrimination and retaliation, and her Charge was docketed as Charge # 530-2024-06323.

48.     Presumably as a result of Plaintiff's pregnancy, discrimination concerns in general, and complaint that her pregnancy was a factor in her mistreatment - - Plaintiff was informed in 2024 that Defendant was considering no longer using part-time police officers (yet another potential pretext to limit or remove Plaintiff entirely). Thus, the sudden desire to eliminate part-time police personnel (Plaintiff) is yet another adverse action against Plaintiff or which she seeks relief in this lawsuit.

49.     On or about July 29, 2024, Defendant submitted a Position Statement to the EEOC in response to Plaintiff's Charge of discrimination and retaliation. Defendant's surprisingly short, 3-paragraph response to the actual merits of Plaintiff's Charge, offered little information and merely implied there was a legitimate business reasons for eliminating Plaintiff's part-time officer job. As explained more infra, the "job elimination" story seemed too absurd, so Defendant changed its reasons multiples times therefore for why Plaintiff would be terminated.

50.     From mid-2024 through 2025 (when Plaintiff was terminated, discussed below), Plaintiff continued to be denied scheduling, shifts, and other opportunities.

51.     In or about the spring of 2025, Chief Newhall separated from Defendant purportedly voluntarily. Upon information and belief, Chief Newhall was compelled to end his employment due to allegations of impropriety and/or misconduct.

52.     As of the late summer of 2025, Jeffrey O'Brien (hereinafter, "Chief O'Brien") was appointed as the new Chief of Police (who remains in this role).

53.     Chief O'Brien was fully aware of Plaintiff's open and pending EEOC claims, legal concerns, and prior discrimination complaints upon hiring as the new Chief of Police.

54.     Chief O'Brien perpetuated the non-scheduling of Plaintiff, the failure to offer Plaintiff available work and shifts, and continued a pattern of retaliation against Plaintiff. In fact, Plaintiff had not been scheduled for a single shift by Chief O'Brien.

55.     Instead of continuing the guise of needing to eliminate a part-time officer role, on or about August 25, 2025, Chief O'Brien took an entirely different direction informing Plaintiff she was facing a termination decision (via a letter titled "Loudermill Hearing Notice") for alleged misconduct from roughly a year earlier (*in the summer or fall of 2024*).

56.     The August 25, 2025 Loudermill Hearing Notice focused on seeking a response as to allegations about Plaintiff having a domestic dispute with someone whom she was in a past relationship with in mid-late 2024.

57.     Plaintiff promptly provided a comprehensive 3-page response responding in detail to the baseless allegations were nothing more than a different (false) approach to finding *any possible* rationale to get rid of Plaintiff. Plaintiff provided her aforesaid 3-page response to Katharine J. Weeder, Esq. ("Weeder"), as her law firm was appointed as the Solicitor for such

matters of Defendant. Weeder acknowledged receipt of Plaintiff's written response (and Weeder provided the response to Chief O'Brien).

58.     Plaintiff expected she was going to then have a hearing so she could elaborate on any further concerns or answer any questions, so she emailed on September 11, 2025, at 1:43 PM asking Weeder: "Is there a date for my Loudermill hearing? Any correspondence, please email me. I vacated my most recent residence."

59.     For almost 2 months Plaintiff's request and inquiry for a hearing on any concerns in the Loudermill Notice were ignored by Weeder and Defendant as a whole. In fact, Plaintiff was never advised of any opportunity to participate in a hearing as she sought and requested by Plaintiff.

60.     By Letter dated November 3, 2025, without further inquiry, questioning, a hearing, or follow up from Defendant (or Chief O'Brien or Weeder), Defendant changed its entire rationale yet again when communicating Plaintiff's termination to her.

61.     In the November 3, 2025, termination letter to Plaintiff, Defendant explained nothing in the Loudermill Notice to Plaintiff (to which she gave a full response) had anything to do with Defendant's decision to terminate her employment. Instead, Defendant claimed in the 11/3/25 termination letter that Plaintiff was now solely being terminated for not being cooperative in mid-August of 2025 with questioning about incidents occurring almost a year earlier (not related to any incidents themselves).

62.     Plaintiff had only been afforded very sporadic shifts after her initial EEOC Charge was filed in May of 2024 (apparently only when need arose on the part of Defendant). Thus, the actual series of events were:

> (1) Plaintiff had been told she was going to be terminated due to elimination of her part-time role during her EEOC proceedings.

(2) Defendant did not eliminate the part-time role, but instead refused to schedule Plaintiff with enough work to sustain herself trying to force her to quit.

(3) When Plaintiff refused to quit and took any sporadic shift she could get, Defendant feigned the need to terminate Plaintiff for alleged misconduct a year earlier about a non-work personal matter with her then significant other.

(4) When Plaintiff responded about the impropriety of raising a personal matter from a year earlier **and** that the prior Chief had confirmed it was a non-issue, Defendant changed its rationale to Plaintiff not properly being cooperative in questioning about the issue in August of 2025 (even though the 2024 matter had nothing to do with Plaintiff's termination).

(5) Defendant apparently finds it plausible that that Plaintiff's termination was for a legitimate reason when it refused to schedule Plaintiff for at least six (6) months prior to concocting a reason to formally "terminate" Plaintiff (which was modified at least 3 times).

63.    Plaintiff has been a victim of ongoing discrimination and retaliation, culminating in her enduring the following adverse actions: (1) denial of full-time jobs in 2024 and thereafter; (2) not being scheduled for many available work shifts and assignments in 2024 - 2025 (or even up to part-time work); (3) a constructive termination in 2025 prior to even being formally terminated (by virtue of non-scheduling from the spring of 2025 – October of 2025); and (4) her actual communicated termination on or about November 3, 2025. These are the adverse actions for which Plaintiff seeks equitable financial and legal relief in Counts I and II of her lawsuit.

## COUNT I
## <u>Violations of Title VII of the Civil Rights Act of 1964</u>
### (Discrimination & Retaliation)

64.    The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

65.    Plaintiff suffered all adverse actions outlined in this lawsuit because of her gender, pregnancy, and/or in retaliation for concerns she expressed about discriminatory treatment while employed.

66.     These actions as aforesaid constitute violations of Title VII, and Plaintiff properly exhausted her administrative remedies before filing this lawsuit on all legal claims asserted in this matter.

## COUNT II
### Violations of the Pennsylvania Human Relations Act
#### (Discrimination & Retaliation)

67.     The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

68.     Plaintiff suffered all adverse actions outlined in this lawsuit because of her gender, pregnancy, and/or in retaliation for concerns she expressed about discriminatory treatment while employed.

69.     These actions as aforesaid constitute violations of the PHRA, and Plaintiff properly exhausted her administrative remedies before filing this lawsuit on all legal claims asserted in this matter.

**WHEREFORE**, Plaintiff prays that this Court enter an Order providing that:

A.     Defendant is to compensate Plaintiff, reimburse Plaintiff, and make Plaintiff whole for any and all pay and benefits Plaintiff would have received had it not been for Defendant's illegal actions, including but not limited to back pay, front pay, salary, pay increases, bonuses, insurance, benefits, training, promotions, reinstatement, and seniority. Plaintiff expressly seeks all equitable relief in the form of reinstatement (and other similar relief) where appropriate, applicable, and capable of being ordered;

B.     Plaintiff is to be accorded other equitable and legal relief as the Court deems just, proper, and appropriate, as well as damages for emotional distress / pain and suffering;

C.     Plaintiff is to be awarded the costs and expenses of this action and reasonable attorney's fees as provided by applicable federal and state law; and

D.    Plaintiff is to be given a jury trial as demanded in the caption of this Complaint.


Respectfully submitted,

**KARPF, KARPF & CERUTTI, P.C.**

By:

Ari R. Karpf, Esq. (91538)
8 Interplex Drive, Suite 210
Feasterville-Trevose, PA 19053
(215) 639-0801
akarpf@karpf-law.com


Dated: November 5, 2025

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**CASE MANAGEMENT TRACK DESIGNATION FORM**

|  |  |  |
|---|---|---|
| Coleen Breslin | : | CIVIL ACTION |
|  | : |  |
| v. | : |  |
|  | : |  |
| Borough of Souderton | : | NO. |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255. ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health and Human Services denying plaintiff Social Security Benefits. ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2. ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from exposure to asbestos. ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are commonly referred to as complex and that need special or intense management by the court. (See reverse side of this form for a detailed explanation of special management cases.) ( )

(f) Standard Management – Cases that do not fall into any one of the other tracks. (x )

| | | |
|---|---|---|
| 11/5/2025 | | Plaintiff |
| **Date** | **Attorney-at-law** | **Attorney for** |
| 215-639-0801 | 215-639-4970 | akarpf@karpf-law.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

(Civ. 660) 10/02

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**DESIGNATION FORM**

Place of Accident, Incident, or Transaction: _Defendants place of business_

---

***RELATED CASE IF ANY:*** Case Number:_____ Judge:_____

1. Does this case involve property included in an earlier numbered suit?     Yes ☐

2. Does this case involve a transaction or occurrence which was the subject of an earlier numbered suit?     Yes ☐

3. Does this case involve the validity or infringement of a patent which was the subject of an earlier numbered suit?     Yes ☐

4. Is this case a second or successive habeas corpus petition, social security appeal, or pro se case filed by the same individual?     Yes ☐

5. Is this case related to an earlier numbered suit even though none of the above categories apply? If yes, attach an explanation.     Yes ☐

I certify that, to the best of my knowledge and belief, the within case ☐ **is** / ☒ **is not** related to any pending or previously terminated action in this court.

---

**Civil Litigation Categories**

**A.** *Federal Question Cases:*

☐ 1. Indemnity Contract, Marine Contract, and All Other Contracts)
☐ 2. FELA
☐ 3. Jones Act-Personal Injury
☐ 4. Antitrust
☐ 5. Wage and Hour Class Action/Collective Action
☐ 6. Patent
☐ 7. Copyright/Trademark
☐ 8. Employment
☐ 9. Labor-Management Relations
☒ 10. Civil Rights
☐ 11. Habeas Corpus
☐ 12. Securities Cases
☐ 13. Social Security Review Cases
☐ 14. Qui Tam Cases
☐ 15. Cases Seeking Systemic Relief **\*see certification below\***
☐ 16. All Other Federal Question Cases. *(Please specify)*:_____

**B.** *Diversity Jurisdiction Cases:*

☐ 1. Insurance Contract and Other Contracts
☐ 2. Airplane Personal Injury
☐ 3. Assault, Defamation
☐ 4. Marine Personal Injury
☐ 5. Motor Vehicle Personal Injury
☐ 6. Other Personal Injury *(Please specify)*:_____
☐ 7. Products Liability
☐ 8. All Other Diversity Cases: *(Please specify)*_____

I certify that, to the best of my knowledge and belief, that the remedy sought in this case ☐ **does** / ☒ **does not** have implications beyond the parties before the court and ☐ **does** / ☒ **does not** seek to bar or mandate statewide or nationwide enforcement of a state or federal law including a rule, regulation, policy, or order of the executive branch or a state or federal agency, whether by declaratory judgment and/or any form of injunctive relief.

---

**ARBITRATION CERTIFICATION (CHECK ONLY ONE BOX BELOW)**

I certify that, to the best of my knowledge and belief:

☒ Pursuant to Local Civil Rule 53.2(3), this case is not eligible for arbitration either because (1) it seeks relief other than money damages; (2) the money damages sought are in excess of $150,000 exclusive of interest and costs; (3) it is a social security case, includes a prisoner as a party, or alleges a violation of a right secured by the U.S. Constitution, or (4) jurisdiction is based in whole or in part on 28 U.S.C. § 1343.

☐ None of the restrictions in Local Civil Rule 53.2 apply and this case is eligible for arbitration.

NOTE: A trial de novo will be by jury only if there has been compliance with F.R.C.P. 38.

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
BRESLIN, COLEEN

**DEFENDANTS**
BOROUGH OF SOUDERTON

**(b)** County of Residence of First Listed Plaintiff  Bucks
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant  Montgomery
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Ari R. Karpf, Esq.; Karpf, Karpf & Cerutti, P.C., 8 Interplex Drive, Suite 210, Feasterville-Trevose, PA 19053; 215-639-0801; akarpf@karpf-law.com

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | | | |
|---|---|---|---|
| ☐ 1 | U.S. Government Plaintiff | ☒ 3 | Federal Question *(U.S. Government Not a Party)* |
| ☐ 2 | U.S. Government Defendant | ☐ 4 | Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                        *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal | ☐ 376 Qui Tam (31 USC |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Product Liability | | 28 USC 157 | 3729(a)) |
| ☐ 140 Negotiable Instrument | Liability | ☐ 367 Health Care/ | | **INTELLECTUAL** | ☐ 400 State Reapportionment |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| & Enforcement of Judgment | Slander | Personal Injury | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted | Liability | ☐ 368 Asbestos Personal | | ☐ 835 Patent - Abbreviated | ☐ 460 Deportation |
| Student Loans | ☐ 340 Marine | Injury Product | | New Drug Application | ☐ 470 Racketeer Influenced and |
| (Excludes Veterans) | ☐ 345 Marine Product | Liability | | ☐ 840 Trademark | Corrupt Organizations |
| ☐ 153 Recovery of Overpayment | Liability | **PERSONAL PROPERTY** | | ☐ 880 Defend Trade Secrets | ☐ 480 Consumer Credit |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | | Act of 2016 | (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | ☐ 371 Truth in Lending | **LABOR** | | ☐ 485 Telephone Consumer |
| ☐ 190 Other Contract | Product Liability | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | **SOCIAL SECURITY** | Protection Act |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Property Damage | Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 196 Franchise | Injury | ☐ 385 Property Damage | ☐ 720 Labor/Management | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ |
| | ☐ 362 Personal Injury - | Product Liability | Relations | ☐ 863 DIWC/DIWW (405(g)) | Exchange |
| | Medical Malpractice | | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 751 Family and Medical | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | Leave Act | | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information |
| ☐ 230 Rent Lease & Ejectment | ☒ 442 Employment | ☐ 510 Motions to Vacate | ☐ 791 Employee Retirement | ☐ 870 Taxes (U.S. Plaintiff | Act |
| ☐ 240 Torts to Land | ☐ 443 Housing/ | Sentence | Income Security Act | or Defendant) | ☐ 896 Arbitration |
| ☐ 245 Tort Product Liability | Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party | ☐ 899 Administrative Procedure |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 535 Death Penalty | **IMMIGRATION** | 26 USC 7609 | Act/Review or Appeal of |
| | mployment | **Other:** | ☐ 462 Naturalization Application | | Agency Decision |
| | ☐ 446 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | ☐ 950 Constitutionality of |
| | Other | ☐ 550 Civil Rights | Actions | | State Statutes |
| | ☐ 448 Education | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - | | | |
| | | Conditions of | | | |
| | | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | | |
|---|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer | ☐ 8 Multidistrict Litigation - Direct File |

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Title VII (42USC2000)
Brief description of cause:
Violations of Title VII and the PHRA.

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE _____   DOCKET NUMBER _____

DATE  11/5/2025

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____